UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                     Plaintiff,

                                                                        ORDER
vs.                                                        20-MJ-574-MJP-4

JAKEEL IRVIN a/k/a TICK,

                     Defendant.
_____

**Pedersen, M.J.** The matter is before the Court on the government's motion, made on the record orally on April 15, 2020, to detain the defendant pending the resolution of the charges filed against him. The parties have proffered information to the Court at a hearing on the record held on April 20, 2020. Defendant appeared by video link from the Monroe County Jail, his retained counsel, Michael Schiano, Esq., appeared via telephone link, and Cassie Kocher, AUSA, represented the government. Both sides proceeded by proffer. After reviewing the facts, and applying the law, I find that no condition or combination of conditions can reasonably assure the appearance of the defendant or the safety of the community. Therefore, I order the defendant detained.

## FINDINGS OF FACT

Based on the proffers, as well as the information contained in the affidavit supporting the complaint and the Pretrial Services report, I make the following findings of fact:

1

1. A criminal complaint was brought before the undersigned on April 10, 2020, alleging that between in or about April 2018 and December 2018, in the County of Monroe in the Western District of New York and elsewhere, defendant Jakeel Irvin a/k/a Tick ("Defendant" or "Irvin"), with others known and unknown, did conspire to possess with intent to distribute, and to distribute, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance; a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance; and a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 84l(a)(l) and 846.

2. Defendant faces a minimum of five years, and a maximum of 40 years of imprisonment if convicted of the charged offenses.

3. In April of 2018, law enforcement began investigating the drug trafficking activities of individuals selling controlled substances in the area of Wilkins Street between Thomas Street and Joseph Avenue, Rochester, New York, Western Judicial District of New. The investigation was triggered by several overdose deaths that were all linked to a phone number for co-defendant Jonathan Torres. The investigation revealed that Jonathan Torres a/k/a Joey a/k/a Joey Crack ("J. Torres"), was the leader of a Rochester-based drug trafficking organization (hereinafter referred to as the TORRES DTO or DTO) that was responsible for distributing cocaine, and substances containing a mixture of heroin and fentanyl in the City of Rochester. Members of the organization also possessed firearms in furtherance of the organization's drug trafficking activity.

4. The investigation revealed that Defendant, 25 years old of 83 Bernard Street, Rochester, New York, obtained quantities of drugs for sale and distributed controlled substances in furtherance of the conspiracy. While J. TORRES was in custody, IRVIN took over many duties to ensure the DTO remained operational. IRVIN has a November 18, 2013 conviction in Rochester City Court for Loitering and was sentenced to 90 days confinement.

5. The investigation involved wiretaps and physical and video surveillance.

6. The investigation revealed that IRVIN and JONES utilized 133 Thomas Street, Rochester, New York, as a "stash house" to store and distribute controlled substances.

7. J. TORRES was arrested on August 27, 2018 and charged with Criminal Sale of a Controlled Substance in the Third Degree based upon the April 26, 2018 undercover sale. He ultimately pled guilty to that charge on November 28, 2018 and was sentenced to two years imprisonment followed by two years of post-release supervision. J. TORRES was in custody from August 27, 2018 until his release from New York State Prison on January 23, 2020. While J. TORRES was in custody, IRVIN and JONES continued to run the DTO operations by monitoring the quantity of drugs sold, directing sales, and assisting with packaging of the controlled substances. 12. On September 12, 2018 at approximately 3:35 p.m., an incoming call (Ref #704) was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 481-9430 (Irvin Phone 1) from J. FIGUEROA over telephone instrument (585) 410-1529 (Figueroa Phone I). In sum and substance, J. FIGUEROA told IRVIN that he had something that he wanted IRVIN to test out. Based upon law enforcement's training, experience, expertise, and knowledge of this investigation, they determined that this call demonstrated that J. FIGUEROA was a heroin/fentanyl supplier and that IRVIN was overseeing a network of heroin/fentanyl dealers. It is not uncommon for narcotics distributors to test a new product for purity and/ or potency before commencing sales.

8. On September 29, 2018, at approximately 10:30 a.m., an incoming phone call (Ref #274) to IRVIN was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 481-9430 (Irvin Phone 1) from J. FIGUEROA utilizing telephone instrument (585) 410-1529 (Figueroa Phone 1). In sum and substance, IRVIN told J. FIGUEROA that he was out. J. FIGUEROA said "Let me call bro." Based on law enforcement's experience and knowledge of this investigation, they determined that IRVIN and J. FIGUEROA were working in concert to supplying heroin/fentanyl to an open air drug market located at 133 Thomas Street. J. FIGUEROA told IRVIN that he needed to call his supplier, "Bro," in order to get more.

9. On September 29, 2018, at approximately 12:09 p.m., an outgoing call (Ref #2433) was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 481-9430 (Irvin Phone I) to J. FIGUEROA utilizing telephone instrument (585) 410-1529 (Figueroa Phone 1). In sum and substance, J. FIGUEROA told IRVIN that he was on his way to pick it up and he had to wait for "Bro" to tell him he had it. IRVIN said he could have sold 50 already. Based upon law enforcement's training, experience, expertise, and knowledge of this investigation, they determined that IRVIN was waiting for J. FIGUEROA to deliver more heroin/fentanyl and the wait was slowing down the DTO's drug sales.

10. On September 5, 2018, at approximately 5:49 p.m., an outgoing call (Ref #56) was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 481-9430 (Irvin Phone I ) to JONES from cellular telephone instrument (585) 764-0910 (Jones Phone). In sum and substance, IRVIN and JONES discussed how much money was made from the girl and boy. JONES said she gave IRVIN $600 that was supposed to be put toward the $1600 they owed for the old boy. IRVIN said he paid for that and JONES should come over because he did not want to talk about it on the phone. Based upon law enforcement's training, experience, expertise, and knowledge of this investigation they determined that it was clear that JONES and IRVIN were discussing the amount of heroin/fentanyl and cocaine that had been sold and their profits. Based upon law enforcement's training and experience, they believed that $600 is the equivalent of 10 grams of heroin/fentanyl. This is one of the many calls that occurred while J. TORRES was in custody and demonstrates how IRVIN and JONES continued the DTO's operations despite J. TORRES's absence.

11. On September 10. 2018, at approximately 4:09 p.m., an outgoing call (Ref #405) was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 481-9430 (Irvin Phone 1) to JONES who was utilizing telephone instrument (585) 764-0910 (Jones Phone). In sum and substance, IRVIN told JONES that people were there waiting for her shit. JONES said she was still making it. IRVIN said they had been waiting for two hours and that they had to keep things moving because customers were angry they had to wait and because they were out of the other shit too. Based upon law enforcement's training, experience, expertise, and knowledge of this investigation, they determined that JONES was supplying drugs to IRVIN and IRVIN was upset because he had several customers waiting to buy drugs. At the time of this call, JONES was at 221 Raines Park. At approximately 5:33 p.m. JONES left 221 Raines Park with D.

TORRES in an SUV. JONES was wearing a back pack. Based upon the training and experience of the investigating , JONES left 221Raines Park to deliver drugs that she had just finished packaging for sale.

12. On September 11, 2018, at approximately 6:46 p.m. a call was intercepted over Defendant's phone (585) 481-9430, in which Defendant was speaking with a customer. The customer indicated he had received money from a third party and that he "had to go find him something." Defendant responded "So why didn't you just get it from over here," to which the customer responded "Because he said I can't, because you said I can't get it from you." Defendant responded "Yes you could bro, come back." There are other calls between the Defendant and this customer.

13. On October 11 , 2018, at approximately 11:08 a.m., an outgoing call (Ref #10111) was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 764-0910 (Jones Phone) from JONES to D. TORRES utilizing telephone instrument (585) 300-1095 (Torres Phone l). In sum and substance, JONES directed D. TORRES to go see Tick a/k/a IRVIN and get $700. D. TORRES was then observed walking from Joseph Avenue to 133 Thomas Street. Based upon law enforcement's training, experience, expertise, and knowledge of this investigation, they determined that 133 Thomas Street is a location where heroin/fentanyl and cocaine were sold and this location was controlled by and operated by IRVIN.

14. On October 18, 2018, at approximately 1:18 p.m., an incoming call (Ref #12521) was lawfully intercepted during the execution of an eavesdropping warrant over cellular telephone instrument (585) 764-0910 (Jones Phone) to JONES from W.B. utilizing cellular telephone instrument (XXX) XXX-6714. In sum and substance, JONES told W.B. that she had given Tick $1,800 and that "what's his name" still had 4 or 5 bundles on him. JONES stated that Tick a/k/a IRVIN gave her 16 grams that came from Mach a/k/a J. FIGUEROA. Based upon law enforcement's training, experience, expertise, and knowledge of this investigation, they determined that this call demonstrated that JONES was acting in concert with IRVIN a/k/a Tick and J. FIGUEROA a/k/a Mach, to sell controlled substances in the area of Wilkins Street and Thomas Street.

15. The lawful wiretapping also demonstrated the Defendants use of violence and gun possession. On August 1, 2018, at approximately 11:17 p.m., an outgoing call (Ref# l 959) was intercepted over telephone instrument (585) 532-4040 (Torres Phone 2), to telephone instrument (XXX) XXX-9439. In sum and substance, J. TORRES called an unknown female and complained about a "beef" or argument some of his workers were having with another group. J. TORRES and a few of his workers

16. went over to fight the group and "Tick" a/k/a IRVIN, started shooting at the rival group. J. TORRES stated, "So all this shit but they gonna wait till I fucking pull up Tick going start fucking shooting at people . . . now everywhere I go, I gotta have my gun on me, because . . . man, ain't nobody gonna stop my flow."

16. The investigation revealed that 133 Thomas Street, Rochester, NY was utilized by IRVIN. During the search of 133 Thomas Street on November 29, 2018, officers recovered approximately $1,454.00 in United States currency, 81 baggies containing cocaine, a total of approximately 203 baggies containing a mixture of heroin and fentanyl, assorted drug packaging paraphernalia, and multiple electronic devices. The recovered substances were tested by the Monroe County Crime Lab.

*Background*

Defendant is 25 years old. He was born in Rochester, New York and has resided there his entire life. His family consists of his parents, Nathaniel Irvin (age 48) and Antoinette Latson (age 47) and his four siblings, Omar Latson (age 32), James Johnson (age 30), Nathaniel Irvin (age 27), and Princess Irvin (age 24). His parents and siblings all reside in Rochester, New York. Defendant indicated that he has a good relationship with his parents.

At the time of his arrest, Defendant had resided at 40 Strathmore Circle in Rochester for two years with his girlfriend and their three children. Prior to that he lived at 83 Bernard Street in Rochester with his girlfriend, and before that Defendant reported that he lived with his mother at 1 Champlain Street in Rochester for two years. However, 1 Champlain Street in Rochester is not a valid address.

Defendant has been in a relationship with his girlfriend for two years, and together they have two children and with another child on the way. Defendant's girlfriend's four-year-old child from a previous relationship also resides with them. Defendant has indicated that he will return to their residence if released.

6

When interviewed by law enforcement, Defendant's girlfriend stated that there were no firearms at the Strathmore Circle residence. However, after Defendant indicated that there was a shotgun at the residence, Defendant's girlfriend admitted the same. Defendant's girlfriend also indicated that she has lived at 40 Strathmore Circle in Rochester since 2018, and that she and Defendant also have a residence located at 83 Bernard Street in Rochester, New York. Defendant's counsel proffered that 83 Bernard Street was the residence in which Defendant lived when the couple broke up for a short period of time.

Defendant does not have a GED. He last attended 10th grade. He does not have a U.S. passport and has never travelled outside of the United States. Defendant is unemployed and has never held a job. However, he receives Social Security/Disability Income. He also earns approximately $2,400.00 a year breeding French bulldogs and pit bulls. Defendant's girlfriend indicated that she would be able to help with bail should Defendant be released.

Defendant has suffered gunshot wounds on at least two separate occasions. In 2013, he was shot in both legs. On March 24, 2020, Defendant was shot in his right arm. Defendant was also involved in a dirt bike accident several years ago. Defendant has trouble walking. It appears that Defendant is in good mental health. He does not drink or use illegal drugs, and has never attended any substance abuse treatment program.

Defendant does not have a significant criminal history, only having been charged with loitering in 2013, for which he was sentenced to 90 days in jail. He was not on

parole or probation at the time of the instant offense. However, Defendant is well known to law enforcement. The government obtained 37 pages of Field Interview Forms ("FIF") going back to 2016, which documents Defendant's extensive history of contacts with law enforcement. The FIFs reveal that Defendant is a documented True Boon gang member, which was determined by individuals with whom he associates, social media, and information from citizens. Moreover, the FIFs indicated that Defendant has been involved in on-going drug dealing. For example,

- On April 1, 2020, a concerned citizen told law enforcement that Defendant was running drug sales at 85 Thomas Street and details given by the concerned citizen were corroborated by police, including the vehicle out of which Defendant was operating.
- In April 2020, a concerned citizen called about Defendant running a gatehouse at 21 Bloomingdale Street. Law enforcement executed a search warrant at this location on March 11, 2020, and found 54 bags of cocaine, 74 envelopes of fentanyl, new and unused packaging in the kitchen, and 200 envelopes of fentanyl that were buried in the backyard.
- In December 2016 and November 2015, law enforcement was provided with information that Defendant was selling drugs on Wilkins Street and he would hide the drugs in a trash can. Law enforcement responded to the November 2015 call and recovered 23 bags of crack cocaine, 30 bags of powder cocaine, and 34 bags of heroin on the west side of 146 Wilkins Street.

- In February 2016, law enforcement received intelligence that Defendant was selling out of a vehicle on Wilkins Street and the concerned citizen stated that he or she saw a gun and money in the vehicle. The vehicle described was known to law enforcement.

In addition to documented gang ties, the FIFs also demonstrated Defendant's links to violence. On July 19, 2016, law enforcement responded to 26 Peckham Street for shots fired and received information that led them to believe that Defendant was the target of the shooting. Defendant has also been seen in the company of an individual who is incarcerated for violent crimes and drug crimes and an individual who was murdered in 2018. The Rochester Police Department has received information that Defendant has hired an individual to shoot people.

Finally, on March 24, 2020, at approximately 9:40 p.m. in Rochester, New York, Defendant was shot in his right arm by an individual named LaShawn Miller. Defendant sought emergency medical services at a hospital but was uncooperative when police attempted to question him about the shooting. Defendant told police he did not know where the shooting occurred. It is alleged that Defendant has an ongoing dispute with Mr. Miller and his son, LaShawn Miller Henderson. After the shooting, Defendant posted on Facebook that he was shot with a .22 caliber gun and commented: "Word to [ ]. I love this shit. [ ] I'ma show a nigga how it go."

## STANDARD OF LAW

The government is moving for detention on both risk of flight and dangerousness grounds. For risk of flight, the government bears the burden of showing by a preponderance that no condition or combination of conditions will

reasonably assure the defendant's presence in court. For dangerousness, the government bears a higher burden of clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community.

### *Presumption*

The government is relying on the presumption pursuant to 18 U.S.C. 3142(e)(3)(A), which states:

> (3) Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed—
>
>> (A) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

The presumption alone is enough to show that detention is warranted, unless the defendant produces some evidence relating to the "G" factors in 18 U.S.C. § 3161(g). In that case, the presumption drops out, but is still a factor to consider along with the G factors.

A defendant bears the burden of forward with evidence to rebut the presumption, but the burden of persuasion remains on the government. *See United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986) (pertaining to the risk of flight); *see also United States v. Rounds*, 619 Fed. App'x 40 (2d Cir. 2015) (summ. order) (applying presumption to both risk of flight and dangerousness).

*G factors*

In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the Court is required to consider the available information concerning—

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

## CONCLUSIONS OF LAW

Based upon my findings of fact I make the following conclusions of law. With regard to the first (g) factor—the nature and circumstance of the offense charged,

Defendant is charged with conspiring to possess with intent to distribute, and to distribute, 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance; a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance; and a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 84l(a)(l) and 846. Since the charged offense involves controlled substances, this factor weighs in favor of detention.

> The second (g) factor is the weight of the evidence against the person.

> it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of "danger." Senate Report, *supra,* at 15, *reprinted in* 1984 U.S. Code Cong. & Ad. News at 3198. Yet, the degree of that danger remains critical under § 3142(g). To determine that degree and decide if a defendant should be detained, a judicial officer must weigh factors such as the nature and circumstances of the crime charged, whether it involved violence or drugs, the personal history of the person, the seriousness of the danger posed by the person's release, and the evidence of the individual's guilt.

*United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985).

The evidence against Defendant, amassed through surveillance, wiretaps, and search warrants demonstrating his involvement in possessing and distributing controlled substances, and engaging in violence, and in particular, shooting at people[1], as discussed above, is strong and powerfully weighs in favor of detention.

With regard to the third (g) factor, while Defendant does appear to have strong ties to the community and does not have a significant criminal history, the Complaint,

---

[1] As the United Supreme Court has noted, "drugs and guns are a dangerous combination." *Smith v United States*, 508 U.S. 223, 240 (1993).

12

wiretap conversations and FIFs demonstrate Defendant's repeated behavior of selling controlled substances and utilizing violence in connection with the same. This factor weighs in favor of detention.

With regard to the final (g) factor, the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release, Defendant has been charged with possessing and distributing large amounts of controlled substances. Further, Defendant allegedly was part of a drug ring that engaged in violence in connection with its possession and distribution of controlled substances. In addition, Defendant was recently shot by someone with whom he has an on-going dispute and there is a risk of retaliation. Defendant is also a documented member of the True Boons gang. These facts demonstrate that Defendant is a danger to the community, and weigh in favor of detention.

Based upon the forgoing, I find by a preponderance of the evidence that no condition or combination of conditions will reasonably assure Defendant's presence in court. Defendant is a flight risk given that he is facing serious criminal charges which, if convicted, Defendant faces a minimum prison sentence of five years and a maximum prison sentence of forty years. He could also be responsible for a large monetary fine.

Moreover, based upon my findings of fact and the presumption under 18 U.S.C. § 3142(e)(3)(A), I find, by clear and convincing evidence, that no condition or combination of conditions could reasonably assure that Defendant, if released on these charges, would not resume his activities related to possessing and distributing

controlled substances and engaging in violence. Consequently, I order him detained pending trial. Defendant may, of course, have an exception to my ruling, and may appeal it to the district court.

SO ORDERED.

DATED: April 23, 2020
Rochester, New York

_____
MARK W. PEDERSEN
United States Magistrate Judge